MENES ALEXANDER WEIGHTMAN,

        Plaintiff,

        v.                                            Case No. 22-cv-1447-bhl

ELLEN O'BRIEN, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

        Plaintiff Menes Alexander Weightman, an inmate at the Oshkosh Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims in connection with Defendants' alleged deliberate indifference to his foot injury and pain. On October 19, 2023, Defendants filed a summary judgment motion, which was fully briefed on January 3, 2024.[1] For the reasons explained below, the Court will grant Defendants' summary judgment motion and dismiss this case.

### BACKGROUND

        At the relevant time, Weightman was incarcerated at Waupun Correctional Institution, where Diana Simmons worked as an advanced practice nurse prescriber, Dr. Ellen O'Brien worked as an orthopedic specialist on an as-needed basis, and Dr. Cheryl Jeanpierre worked as an advanced care provider. On July 13, 2022, Weightman fractured his foot while playing basketball. Weightman asserts that correctional staff contacted the health services unit, but he was directed to

---

[1] On January 3, 2024, Defendants filed a motion for leave to file a late reply brief, Dkt. No. 44, which the Court will grant.

submit a health services request. Weightman did so, complaining that his foot was broken and he was experiencing a pain level of nine out of ten. The next day, on July 14, 2022, a nurse evaluated him and issued an ace wrap, ice bag, and ibuprofen. She also consulted with an advanced care provider who determined an x-ray was warranted. The nurse educated Weightman on elevating his foot and icing it as much as possible. Dr. Jeanpierre also ordered x-rays, an ace bandage, an ice bag, and ibuprofen to be kept on person for three days. Dkt. Nos. 34, 41 at ¶¶1-6, 15-18.

Weightman's foot was x-rayed a few days later, on July 18, 2022. The x-ray revealed that the long bone on the outside of his foot was fractured with some malalignment. Dr. Jeanpierre reviewed the x-rays and on the very next day, ordered that Weightman be given crutches for 90 days, a wheelchair for distances for 90 days, and an extra pillow to elevate his foot for a full year. She also referred Weightman to physical therapy. Weightman saw physical therapy that same day and was fitted with a medical boot and taught how to use the crutches. He was also given a low bunk restriction. No further follow-up with physical therapy was indicated. Dkt. Nos. 34, 41 at ¶¶19-22.

On July 20, 2022, after Weightman complained about still being on the top bunk, Dr. Jeanpierre ordered a low bunk/low tier restriction for 90 days. That same day, a nurse sent an urgent referral to Waupun Memorial Hospital. Weightman was seen by an orthopedic specialist, Dr. Eric Nelson, via telemedicine the following day, on July 21, 2022. Dr. Nelson noted that Weightman's foot "actually look[ed] pretty good" and that he did not detect "any significant swelling." After reviewing x-rays, Dr. Nelson concluded that conservative treatment was best and recommended the continued use of an ace bandage and cast boot. Dr. Nelson expressed a desire to see Weightman again in three weeks and asked that a set of foot films be obtained a few days prior to his next appointment. Dkt. Nos. 34, 41 at ¶¶23-27.

2

A few days later, on July 24, 2022, Weightman sent multiple health services requests asking for a copy of his x-rays. Weightman complained that the knot on the side of his foot was getting bigger and his foot did not look or feel right. Heeightman also indicated that the pain medication was no longer working and stated his belief that his foot should be set and splinted. Staff repeatedly told Weightman that he had been referred to orthopedics. On July 29, 2022, Simmons reminded Weightman to keep his foot elevated to prevent swelling and also remarked that the swelling could be a side effect of his blood pressure medication. Weightman was referred to an advanced care provider, and Simmons refilled his order for ibuprofen for 29 days. Dr. Jeanpierre left the institution in August. Dkt. Nos. 34, 41 at ¶¶28-32.

On August 18, 2022, Weightman complained to health services that his foot did not appear to be healing correctly. He was informed that he was referred to an advance care provider. On September 2, 2022, after learning that Weightman had complained about a delay in treatment, Simmons placed an order for a follow-up appointment with the onsite orthopedic provider as well as a telemed visit with Dr. Nelson. Simmons also ordered that follow-up x-rays be taken before Weightman's appointment with Dr. Nelson. Dkt. Nos. 34, 41 at ¶¶33-34.

On September 6, 2022, Weightman had another x-ray taken. The results indicated that the fracture was healing. Two days later, Weightman saw Dr. Nelson for a follow-up appointment. He noted minimal progression in the healing and recommended placing a screw across the fracture site to stimulate healing and that Weightman be provided with a bone stimulator. In response, Weightman submitted a health services request asking if health services concurred with Dr. Nelson's conclusions. He was informed that the onsite orthopedic specialist wanted to review the x-rays because the radiologist's and Dr. Nelson's reports appeared to conflict with each other. On September 15, 2022, Simmons reviewed the radiologist's and Dr. Nelson's reports. She then

3

submitted a request via email for a second opinion from Dr. O'Brien, the onsite orthopedic specialist. Dkt. Nos. 34, 41 at ¶¶35-39.

The next day, Simmons consulted with Dr. O'Brien in person. She reviewed the x-rays, the radiologist's report, and Dr. Nelson's report. Dr. O'Brien concluded that Weightman's fracture was healing, and surgery may not be necessary. She suggested that conservative treatment continue and recommended that x-rays be taken on a regular basis to monitor progress. Simmons informed Weightman of Dr. O'Brien's recommendation. According to Simmons, she also discussed pain management and expectations with Weightman. Weightman denies that they discussed other pain medication options and further asserts that Simmons refused to let him see his x-rays. At Weightman's request, a request for authorization of the surgery was submitted to the Class III Committee, the group of medical and corrections staff who authorize non-routine medical treatments. The committee denied the request, informing Weightman that if future x-rays revealed delayed healing, a bone stimulator could be ordered and/or a request for surgery could be resubmitted. Simmons ordered an x-ray the same day the committee refused to authorize surgery. Dkt. Nos. 34, 41 at ¶¶40-46.

On October 27, 2022, a few weeks after the committee's refusal, Weightman expressed that he was still in pain and would like to have the surgery. An x-ray on October 31, 2022 showed continued healing. Weightman highlights that he was never allowed to see his x-rays. Over the next couple weeks, Weightman continued to inform health services that he was in pain and his foot was still swollen. He was informed that he had a pending appointment with an advance care provider. On November 18, 2022, Weightman was not able to have his foot x-rayed as scheduled because he had COVID and was quarantined. Weightman continued to complain about his foot

pain and was informed that he could purchase ibuprofen at the canteen. Dkt. Nos. 34, 41 at ¶¶47-55.

According to Simmons, on December 12, 2022, she informed nursing staff that she wanted to use the bone stimulator but needed to confirm it was in the building. That same day, Weightman's foot was again x-rayed and continued healing was again confirmed. Simmons saw Weightman on December 15, 2022, and noted that he was able to walk without difficulty while wearing the boot. She informed him that multiple radiologists had confirmed from the x-rays that the fracture was healing. She also ordered ibuprofen for him to take as needed for 29 days. Finally, she recommended that he begin treatment with the bone stimulator. Dkt. Nos. 34, 41 at ¶¶56-58.

Simmons explains that there was a delay in setting up the bone stimulator because the one onsite was essentially useless. The machine was old, and the preprogrammed setting could not be rebooted. It is not clear how issues with the bone stimulator resolved, but, according to Simmons, Weightman had the bone stimulator applied every day for 20 minutes from the end of December through February 2023. Weightman asserts that during this period, he repeatedly complained that his foot was swollen and he was in significant pain. On January 23, 2023, Weightman's foot was again x-rayed, and the next day he was informed that the fracture appeared to be healed. He was told he could stop wearing the boot and resume his previous activity level, although application of the bone stimulator would continue through February. Dkt. Nos. 34, 41 at ¶¶59-74.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

5

dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

**1. A jury could not reasonably conclude that Dr. Jeanpierre was deliberately indifferent to Weightman's broken foot.**

To prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). When assessing whether a prison official acted with the requisite state of mind, courts must "examine the totality of an inmate's medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citations omitted). The Seventh Circuit has made clear that the Eighth Amendment does not provide a federal tort claim for prisoners who are simply dissatisfied with their prison medical treatment. To succeed on an Eighth Amendment claim related to medical care, a prisoner must have evidence that the defendant was deliberately indifferent, and , to establish the requisite mental state, "something more than negligence or even malpractice is required." *Id.*

The undisputed facts demonstrate that Dr. Jeanpierre did not violate the Eighth Amendment. Immediately after learning of Weightman's injury, Dr. Jeanpierre ordered an x-ray and approved the orders for an ace bandage, an ice bag, and ibuprofen. A few days later, after confirming his foot was fractured, she ordered crutches for 90 days, a wheelchair for distances for 90 days, and an extra pillow to elevate his foot for a full year. She also referred Weightman to physical therapy, where he was provided with a boot and educated on how to use the crutches. She also ordered a low bunk restriction, which she re-ordered after learning Weightman had not received that accommodation. Finally, within a week of Weightman injuring his foot, she approved an emergency referral to an offsite orthopedic specialist, who confirmed that, at that time, conservative treatment was best. Dr. Jeanpierre stopped treating Weightman within a few weeks of Weightman injuring his foot when she left the institution.

Considering the totality of the care Dr. Jeanpierre provided, no jury could reasonably conclude that she was deliberately indifferent to Weightman or his fractured foot. Weightman complains that she did not evaluate him the same day he injured his foot, but the record demonstrates that she did not learn about his injury until the following day when a nurse asked her whether an x-ray was needed. Dr. Jeanpierre is not responsible for a nurse's failure to alert her more promptly to his health services requests. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (holding that the doctrine of *respondeat superior* cannot be used to hold a supervisor liable for the misconduct of a subordinate). And, in any event, given the overall care Dr. Jeanpierre provided during the one month that Weightman was under her care, no jury could conclude that a one-day delay suggests she was deliberately indifferent to his injury. Weightman also complains that she never evaluated him in person, but he does not explain how an in-person evaluation would have impacted the extensive care she provided. The record demonstrates her multiple efforts to

7

treat Weightmann and her failure to see him in person does not override that evidence. Finally, Weightman complains that he was not allowed to see his x-rays, but Weightman is not a medical professional so he would have gained nothing from viewing them. Dr. Jeanpierre is therefore entitled to summary judgment on Weightman's deliberate indifference claim.

**2. A jury could not reasonably conclude that Dr. O'Brien was deliberately indifferent to Weightman's broken foot.**

Dr. O'Brien, who is an orthopedic specialist that consulted on an as-needed basis with the advanced care providers at Waupun, had limited involvement in the treatment of Weightman's fractured foot. The record shows that, after receiving Dr. Nelson's recommendation for surgery, Simmons, who was then the advance care provider treating Weightman, consulted with O'Brien to help her reconcile a conflict between the radiologist's report, which indicated that Weightman's fracture was healing, and Dr. Nelson's report, which suggested that Weightman's fracture was not healing quickly enough. Dr. O'Brien asserts that she reviewed the x-rays and the reports and agreed with the radiologist that the fracture appeared to be healing. She suggested that conservative treatment continue and recommended that x-rays be taken on a regular basis to monitor progress.

The Seventh Circuit has explained that "[w]ithin the universe of deliberate indifference cases is a narrower category when a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for the condition. [The appellate court has] clarified that these cases are better framed not as deliberate indifference to a serious medical need, but as a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Lockett*, 937 F.3d at 1023 (internal punctuation and citations omitted). It has long been held that, in such cases, courts should "defer to a medical professional's treatment decision unless no minimally competent professional would have so responded under those circumstances." *Id.*

8

(internal punctuation and citations omitted). More to the point, a "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Weightman continues to disagree with Dr. O'Brien's assessment that he did not need surgery at the time Dr. Nelson recommended it. Implicit in her recommendation that the healing process be monitored with regular x-rays was the acknowledgement that a slowing or cessation of the healing process may support the need for surgery in the future. But, as the record shows, the need for surgery never arose because the fracture healed on its own. Weightman offers no evidence supporting a conclusion that Dr. O'Brien's recommendation for continued conservative treatment with regular monitoring substantially departed from the standard of care, and given that his fracture eventually healed without surgery as she predicted, no jury could reasonably reach such a conclusion.[2] Accordingly, Dr. O'Brien is entitled to summary judgment on Weightman's deliberate indifference claim.

### 3. A jury could not reasonably conclude that Simmons was deliberately indifferent to Weightman's broken foot.

As noted, when determining whether a prison official has acted with the requisite state of mind, a court must examine the totality of the care provided; something more than negligence or even malpractice is required. During the time Weightman's care was being transitioned from Dr. Jeanpierre to Simmons, Simmons received reports from Weightman that his foot was swollen and the pain medication was not working. Simmons reminded Weightman to keep his foot elevated and informed him that the swelling could be from his blood pressure medication. Shortly after

---

[2] Weightman also argues that the fracture may have healed, but that does not mean it healed *properly*. Weightman provides no evidence supporting a conclusion that the fracture healed improperly. Dr. Nelson questioned the rate at which the fracture was healing, but he never suggested the fracture was healing improperly.

taking over Weightman's care, she ordered a follow-up visit with Dr. Nelson along with the requested x-rays. Once receiving Dr. Nelson's recommendation, she consulted with the onsite orthopedic specialist. Despite the specialist's recommendation for conservative treatment, at Weightman's insistence, she placed a request that surgery be authorized. The request was denied. Simmons continued to regularly order x-rays to monitor the fracture's healing, with each x-ray confirming continued healing. At times, in response to his complaints of pain, Weightman was advised that he could purchase ibuprofen at the canteen, but at other times, Simmons renewed Weightman's ibuprofen prescription. Simmons observed Weightman walking without difficulty in his boot and was informed by staff that he was active during recreation. Weightman also reported that he was on his feet for long periods of time while he worked. Finally, with regard to the bone stimulator, the Court notes that neither party explains what a bone stimulator is or how it is expected to work. The parties agree that there was a delay in using it because the one at the institution was not functional. Eventually, it was applied to Weightman's foot every day for a little more than two months. Weightman asserts that the machine never worked, but regardless, x-rays revealed that by the end of January, his fracture was completely healed, and he was told he could resume his previous activity level.

Taken as a whole, the record demonstrates that Simmons was appropriately responsive to Weightman's needs and closely monitored the healing of his fracture. Weightman complains that she refused to comply with Dr. Nelson's surgery recommendation, but the evidence shows that, despite Dr. O'Brien's recommendation for conservative treatment, Simmons submitted a request that the surgery be authorized. She is not responsible for the Class III Committee denying that request. And, in any event, mere disagreement between two officials about the proper course of

treatment is insufficient by itself to establish an Eighth Amendment violation. *Pyles*, 771 F.3d at 409.

Weightman also complains that the bone stimulator was to be used *after* surgery and, even if it was appropriate to use without surgery, Simmons delayed applying it. Weightman offers no competent evidence suggesting that a bone stimulator should have been used only after surgery. He is not qualified to opine on the proper usage of a bone stimulator and his unsupported assertions concerning the device cannot support his claim. *See, e.g., Page v. Obaisi*, 318 F. Supp. 3d 1094, 1103-04 (N.D. Ill. 2018) (collecting cases). And, with regard to the so-called delay, he offers no evidence supporting a conclusion that Simmons was responsible for the delay. Simmons explains that the settings on the bone stimulator at Waupun could not be overridden initially. She then made efforts to secure a different bone stimulator, and once she did, she ordered daily sessions for Weightman. Weightman offers no evidence to support his assertions that she did not make efforts to find a working bone stimulator or that the efforts she made were insufficient. Regardless, Weightman insists that the bone stimulator never worked, so he was not harmed in a delay in procuring it, particularly given that x-rays showed the fracture had completely healed within a few weeks of the first application.

Weightman also asserts that Simmons' failure to address his complaints of pain demonstrates deliberate indifference to his suffering. The Seventh Circuit has recognized that pain control is a matter "that requires the application of medical expertise and judgment. *Lockett*, 937 F.3d at 1024 (citing *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)). Weightman complained he was in pain, but he also was able to participate in his daily activities without issue, including walking with his boot, exercising during recreation, and working all day on his feet. Based on his activity level, Simmons' decision to address his pain with only over-the-counter medications

cannot support an Eighth Amendment violation. *See, e.g.*, *DeBoer v. Luy*, 70 F. App'x 880, 883 (7th Cir. 2003); *Snipes*, 95 F.3d at 592 ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations."). Simmons may have misjudged the severity of Weightman's pain or may have failed to timely renew his prescription, but such failures would amount to, at most, negligence, which is insufficient to establish a constitutional violation. Simmons is therefore entitled to summary judgment on Weightman's deliberate indifference claim.

Finally, Weightman was allowed to proceed on state law claims, but because the Court has concluded that he has no federal claims, the Court will relinquish supplemental jurisdiction over the state law claims. *See* 28 U.S.C. §1367(c)(3); *Lavite v. Dunstan*, 932 F.3d 1020, 1034 (7th Cir. 2019). If Johnson wants to pursue those claims, he may do so in state court.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motion (Dkt. No. 32) and their motion to file a late reply brief (Dkt. No. 44) are **GRANTED** and this action is **DISMISSED**. Weightman's state law claims are **DISMISSED without prejudice**. The Clerk of Court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin on March 8, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.